*Decision will be entered under Rule 50.*

J. E. FARRELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 84726, 103430. Promulgated September 19, 1941.

*Charles D. Hamel, Esq.*, and *John Enrietto, Esq.*, for the petitioner. *James H. Yeatman, Esq.*, for the respondent.

168

OPINION.

DISNEY: There is no controversy about the cash payments involved in the transaction. The issue relates to the proceeds of production

payable to petitioner under the oil payment, the contention of petitioner being that they constitute taxable income to him as earned in 1933, 1934, and 1935, and not in 1936 as respondent held in his determination of the deficiency and argues here.

The contention of respondent in general is that under the prevailing circumstances the income was not available to petitioner until 1936. Petitioner did not actually receive the income until 1936 and did not include any part of it in his original returns for the earlier years. It was not until September 1936, five months after actual receipt, that he concluded that the amount received was taxable to him as earned, and filed amended returns. This treatment of the income discloses a conclusion of petitioner at the time it was earned that production under the oil payment resulted in no taxable income to him. It has been held under similar circumstances that the taxpayer was "hardly in a position to urge" to the contrary. *Olson* v. *Commissioner*, 67 Fed. (2d) 726; certiorari denied, 292 U. S. 637.

Petitioner's argument upon brief includes contentions that he was a participant in a joint venture, taxable as a partnership; that Yount-Lee was in the position of a fiduciary or agent for all interested parties or for himself; and that the income was available to him as earned upon furnishing collateral. Under any of these theories it is alleged that the income was taxable in the earlier years as earned as distributable income or income constructively received.

There is nothing in the agreement of March 11, 1931, disclosing any intention of the parties thereto to become associates in a business venture as the term is generally understood. The assignee was under no obligation to the assignors to drill upon or develop the lands covered by the leases except to drill such offset wells as might be necessary to protect the property from drainage and the assignors incurred no liability for expenses incurred by the assignee in developing and operating the property. No provision was made in the agreement for sharing profits and losses in the operation of the leases, the right of the assignors to participation in production being limited to the provisions of the oil payment. It is clear from the agreement entered into that the development and operation of the leases was intended to be a business of the assignee in which the economic interest of the assignors would not exceed the right to participate in gross production sufficient to pay off the oil payment. None of the assignors undertook to assume in the agreement or otherwise any of the obligations of joint venturers. The operation of the leases was the business of Yount-Lee.

Except for provision made in the agreement of March 11, 1931, for a payment to the assignors of $2,000,000 only out of oil and gas produced and saved, which provision was a retention by the assignors of oil and gas in place sufficient to make the payments, *Thomas* v.

*Perkins*, 301 U. S. 655, the agreement would not be otherwise than an ordinary sale of property, with the usual tax consequences. *Marrs McLean*, 41 B. T. A. 565; affd., 120 Fed. (2d) 942. The peculiar law applicable to transactions of this nature makes amounts paid under the oil payment ordinary income to the recipient, with the right to deduction for depletion, instead of a return of capital.

Other than *D. H. Byrd*, 32 B. T. A. 568, no authority is cited on this point. In that case the petitioner received in 1930 an advance from the Owen-Sloan Oil Co. with which to deal in oil property, the money advanced to be repaid from proceeds of sales of property purchased with the funds. Thereafter, after certain expenses of petitioner had been recouped, all moneys received from the leases and royalties sold or retained were to be divided between petitioner and the Owen-Sloan Oil Co. on an equal basis. In 1931 the petitioner and Jack Frost engaged in the business of dealing in and developing oil and gas leases, from which in 1931 they earned profits, one-half of which the Commissioner included in petitioner's taxable income. Petitioner contended that his share of the profits of the business relation with Frost should be reduced one-half on account of a claim asserted by the Owen-Sloan Oil Co. to such share of the earnings. In deciding the question we did not find it necessary to determine whether the business dealings of Byrd and Frost were a joint venture or a partnership. The Commissioner and the petitioner appear to have proceeded under the theory that it was one or the other, although a statement appears in the opinion that the evidence was insufficient to decide whether or not it was a partnership. The case does not control the answer here. We conclude that there was no relation of joint adventure.

Section 1001 (a) (6) of the Revenue Act of 1936 defines the term "fiduciary" as used in the act as meaning "* * * a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for any person." The same definition appears in section 1111 (a) (6) of the 1932 Act and section 801 (a) (6) of the 1934 Act.

Petitioner alleges that Yount-Lee was as much a fiduciary in connection with the operation of the leases as was the receiver appointed by the court in *Commissioner* v. *Owens*, 78 Fed. (2d) 768. In that case the court appointed a receiver to lease land for the benefit of persons ultimately determined in litigation then pending to be the rightful owners of the property, about 225 persons having entered appearances in the title suit. The case of *R. S. Goforth*, 32 B. T. A. 1206, also relied upon by the petitioner, involved similar litigation in which about 75 individuals claimed to be heirs, assignees, or vendees, but the interested parties agreed that the proceeds from the sale of

royalty oil be impounded and held in trust for the persons finally held to be entitled to it. In each case it was held that the income earned prior to the termination of the litigation was taxable to the receiver or trustee as money being accumulated for unascertained persons. Here petitioner held as his own separate property the right to receive out of production an amount sufficient to pay his one-half interest in the oil payment. Petitioner was an ascertained person whose right to receive payments under the oil payment was being contested by his former wife. The controversy was between two ascertained persons, a fact that serves to distinguish this proceeding from the *Owens* and *Goforth* cases. *Commissioner* v. *Owens, supra; Benton Wilson*, 33 B. T. A. 649; *Mary Clark de Brabant*, 34 B. T. A. 951; affd., 90 Fed. (2d) 433.

Here the court did not impound the proceeds from production payable to petitioner; it enjoined petitioner from receiving the money. This injunction was vacated in 1934, when the District Court entered judgment in the case in favor of the defendants, and thereafter the refusal of the holders of the leases to make payments was due entirely to their desire to protect themselves against possible liability to petitioner's former wife.

We do not find in the agreement of March 11, 1931, any terms usually found in instruments creating trusts. Petitioner had title to oil and gas in place, and except for such amount as exceeded, when produced and sold, $1,000,000, did not transfer it to Yount-Lee. *Commissioner* v. *Wilson*, 76 Fed. (2d) 766. Thus title to oil and gas sufficient to pay petitioner's interest in the oil payment was at no time in Yount-Lee. *George L. Craig*, 7 B. T. A. 504.

No authority is cited by petitioner to support his assertion that Yount-Lee in receiving petitioner's share of oil runs was acting as his agent. We find none. The agreement of March 11, 1931, discloses no intention on the part of the assignors to appoint the assignee of the leases their agent to develop and operate the property and sell their proportionate share of the oil produced. The assignee was not, as already pointed out, under any obligation to develop the property except to drill offsetting wells. Neither was it required to sell production to pipe line companies. The contract provided that if Yount-Lee sold the oil produced it "shall account to Grantors for their proportion of the oil * * * on the basis of the sale price" and if the sale price was less than the posted price or the minimum price of 30 cents per barrel, the grantee was to account to the grantors on the basis of the posted price or minimum price, as the case might be. It then provided that Yount-Lee "shall have the option of purchasing said oil (and if said Yount-Lee Oil Company runs the oil it shall be considered a purchase) at the average price posted" by

four of six designated pipe line companies, Yount-Lee, in any event, to "account" to the grantors at the minimum price of 30 cents per barrel. Thus Yount-Lee could have purchased all of the oil at the posted price or at the minimum price of 30 cents per barrel in the event the posted or selling price was less than that amount. In April, May, and June 1933 oil sales were made at less than 30 cents per barrel and Yount-Lee made up the difference. The term "account" used in the contract does not have any great weight under the circumstances in establishing the relationship of principal and agent under the contract. The assignee was to "account" to petitioner, whether the oil and gas was sold to third parties or taken over by the assignee at prices fixed by the agreement. Obviously, if the assignee accepted the production, thereby making it liable to petitioner, it, as a purchaser, would not be acting as an agent of petitioner. Such a transaction would create a debtor and creditor relationship.

The willingness of petitioner to look to Yount-Lee alone for his proportionate share of the proceeds of the oil runs, and not to pipe line companies, does not make Yount-Lee an agent of petitioner. The intent of the contract was to make Yount-Lee liable to the grantors for their proportionate share of the proceeds of oil runs as part of the consideration for the assignment. This liability was not made contingent upon receipt by Yount-Lee of the selling price from the pipe line companies. The receipt of the selling price was a responsibility assumed by Yount-Lee. A run of oil or gas made Yount-Lee liable to petitioner for his proportionate share of the selling price and we think the liability was that of a debtor, not agent.

Assuming that Yount-Lee was agent for petitioner in the sale of the oil and gas, the facts here do not warrant an application of the rule that receipt by an agent is receipt by his principal. The doctrine rests in the constructive receipt theory and has its limitations. In *A. L. Voyer*, 4 B. T. A. 1192, we declined to include in a return filed on the cash basis the amount paid to and retained by the taxpayer's agent, an attorney, to secure the balance of his fee and expenses. In *Tyler* v. *Commissioner*, 72 Fed. (2d) 950, affirming 28 B. T. A. 367, the court pointed out that cases like *Maryland Casualty Co.* v. *United States*, 251 U. S. 342, hold that "receipt by an agent, on behalf of his principal, of income to which the principal is personally entitled without limitation or qualification, constitutes constructive receipt by the principal." The theory of constructive receipt must be sparingly applied. *John A. Brander*, 3 B. T. A. 231.

Here there was no actual receipt by petitioner until 1936. Prior thereto the amount in question was always subject to the outcome of the suit instituted by petitioner's former wife. Until May 1934, a court order expressly forbade petitioner from receiving the income. The alleged agent was made a party to the proceeding and until

the termination thereof declined to turn the money over to petitioner on account of possible liability to plaintiff as a party defendant. This liability was real at all times important. She not only asked the court to declare all property then in possession of petitioner to be community property, but that the property be equally divided and partitioned by the court and that she recover "of both defendants an equal one-half part of the $1,000,000 oil payment which the defendant Yount-Lee Oil Company has agreed to pay" and that any judgment against petitioner for the difference in value of the community estate on August 8, 1931, and at the time of filing suit, be protected by an equitable lien upon the oil payment. She claimed that the community estate had a value on August 8, 1931, of approximately $1,750,000. She claimed a one-half undivided interest in the oil payment payable to petitioner and asked the court for an equitable lien on the other one-half to secure payment of the portion of her alleged interest which had been withdrawn by petitioner. Recovery of his undivided one-half interest in the assignment of petitioner to Yount-Lee and the proceeds accrued under the oil payment was found by the court to be the chief purpose of the suit. *Burguieres* v. *Farrell*, 85 S. W. (2d) 952; 87 S. W. (2d) 463. Thus the proceeds of production received by Yount-Lee were at all times important subject to the demands made by Stella B. Burguieres in her suit, including the prayer for a lien upon the entire interest of the petitioner, and to that extent qualified his right to receive money from his alleged agent.

A further contention of petitioner is that he could have obtained possession of the funds upon furnishing collateral and accordingly the proceeds of oil runs constituted taxable income to him in the years earned, citing *Commissioner* v. *Brooklyn Union Gas Co.*, 62 Fed. (2d) 505. In that case the court authorized withdrawals of funds impounded by its order upon the giving of a bond and permitted future collections to be withheld from impounding upon substituting a bond or securities. The court held that the funds were taxable when earned and not in the year in which the suit, on account of which the money was impounded, was terminated. No like situation prevails here. Prior to June 8, 1934, a court order prevented petitioner from receiving the money as earned. Thereafter he made demands upon Yount-Lee for payment of the amount being withheld from him and in 1935 there was some discussion about paying over the money upon giving satisfactory security. Stanolind's only suggestion on the subject required petitioner to deposit in bank moneys equal in amount to those drawn down—which obviously would have been of no benefit to petitioner. No agreement was ever entered into on the subject. Under the circumstances it can not be said that petitioner was at any time important in a position to receive the fund by giving satisfactory security therefor.

In *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, prior to 1916 the United States instituted suit to oust petitioner from possession of oil lands being operated by it, and in February 1916 secured the appointment of a receiver to operate or supervise the operation of the properties and hold the net income thereof. Income from the properties was paid to the receiver as earned and in 1917, after entry of the final decree by the District Court dismissing the bill and vacating the receivership, the accumulated money was paid by the receiver to the operator. The Government appealed from the decision and in 1922 the litigation was terminated. The question was whether the income earned in 1916, but not paid to the operator until 1917, was income to the petitioner in 1916, 1917, or 1922. The Supreme Court held that the income was not taxable until received in 1917, whether the petitioner filed its return on the cash or accrual basis. In reaching its conclusion the Court said, among other things:

> The net profits were not taxable to the company as income of 1916. For the company was not required in 1916 to report as income an amount which it might never receive. * * * There was no constructive receipt of the profits by the company in that year, because at no time during the year was there a right in the company to demand that the receiver pay over the money. Throughout 1916 it was uncertain who would be declared entitled to the profits. It was not until 1917, when the District Court entered a final decree vacating the receivership and dismissing the bill, that the company became entitled to receive the money. * * *

The Court pointed out that the income in question was not taxable in 1922 because the company became entitled to receive it and actually received it in 1917 and thereafter held it as under a claim of right.

A like case is *National Petroleum & Refining Co.*, 28 B. T. A. 569, where proceeds from the sale of oil were impounded pending the outcome of litigation between two states on the location of property.

In *Sara R. Preston*, 35 B. T. A. 312, a check was received which was payable to the order of two payees who could not agree as to the amount to which each was entitled for services rendered by them to the payor. Thereafter the check was deposited in a joint bank account, subject to withdrawal only by checks bearing the signature of petitioner and the other payee. This Board held in effect that the money represented by the check did not constitute taxable income to the petitioner reporting on the cash basis until litigation to determine the extent of the interest of the parties in the check was terminated.

Another case alleged by the respondent to be on all fours is *London-Butte Gold Mines Co.*, 41 B. T. A. 852; aff'd., 116 Fed. (2d) 478. In that case the petitioner in 1933 made sales of ore produced from properties being operated by it. Thereafter in the same year the petitioner filed suit for the collection of the purchase price and the defendant

deposited with the court the full amount due. At the same time the Mosquito Gold Mines filed a motion in the proceeding, claiming that the ore sold had been mined from its property. Sales were made by the petitioner to another corporation in 1933 and 1934, but it refused to pay until the suit between petitioner and the Mosquito Gold Mines was finally decided. In 1934 the court decided that the ore and the money in the registry of the court belonged to petitioner. The court's decision was affirmed by appellate court and litigation was terminated in 1935. It was held that the income in question was not accruable and therefore not taxable to petitioner until 1935, when the litigation was finally terminated.

We think the principle of these cases controls the answer here. Throughout 1933 and during part of 1934 petitioner was in no position to demand the money and thereafter, until payment in 1936, payment was refused because of the claims asserted by petitioner's former wife. It was not until termination of the litigation in 1936 that it became known who would receive the fund. It was then paid to petitioner. Prior thereto he had no use or enjoyment of the income or a right to use and enjoy it. It was not error for the respondent to treat the amount paid in 1936 as taxable income of that year. Accordingly, pursuant to the stipulation, an order will be entered finding an overpayment of $22,502.46 for 1933 and that there is a deficiency of $198,044.98 for 1936.