Lillian E. Yaeger v. Commissioner. Emma M. Heber and Estate of Henry D. Heber, Deceased, Emma M. Heber, Administratrix v. Commissioner.
Yaeger v. Commissioner
Docket Nos. 4496-62, 4543-62.
United States Tax Court
T.C. Memo 1964-215; 1964 Tax Ct. Memo LEXIS 121; 23 T.C.M. (CCH) 1293; T.C.M. (RIA) 64215; August 17, 1964
Richard B. Dodge, P.O. Box 1495, Santa Ana, Calif., and Jack J. Rimel, for the petitioner in Docket No. 4496-62. F. Edward Little, 458 S. Spring St., Los Angeles, Calif., for the petitioners in Docket No. 4543-62. Roger Rhodes, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income tax of petitioner Lillian E. Yaeger, as follows: Year
Deficiency
1955
$7,248.54
1956
2,753.21
1957
2,929.99
1958
1,177.30
*122 Respondent determined deficiencies in the income tax of petitioners Emma M. Heber and Henry D. Heber, as follows: Year
Deficiency
1956
$1,273.89
1957
7,163.57
1958
304.66
There is, in essence, one issue presented for decision. That issue is whether petitioners Lillian E. Yaeger and Emma M. Heber, during their taxable years in issue, each owned a one-half interest in the net income produced by certain rental real estate, or whether petitioner Lillian E. Yaeger owned the entire net income produced by said real estate. Another aspect of this issue is whether the amounts received by petitioner Emma M. Heber from Lillian E. Yaeger during the years before us represent the proceeds from the sale of Emma Heber's partnership interest to Lillian Yaeger in 1944 or whether these amounts, in fact, constitute commuted payments of Emma Heber's share of the net income from the real estate. Findings of Fact Some of the facts have been stipulated, and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner Lillian E. Yaeger (hereinafter referred to as Yaeger) was during the calendar years 1955 through *123 1958 an unmarried individual residing in Fullerton, California. During those years, she filed her Federal income tax returns, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue at Los Angeles, California. Petitioner Emma M. Heber (hereinafter referred to as Heber) and Henry D. Heber were, during the years 1956, 1957, and 1958, husband and wife. During those years they filed joint Federal income tax returns, prepared on the basis of a calendar year and the cash method of accounting, with the district director of internal revenue at Los Angeles, California. [1]
Heber and Yaeger had been friends and companions since 1928. During the year 1935, and for a number of years thereafter, they resided together in Fullerton, California. Heber, at all times relevant hereto, since 1927 has been a registered nurse. Yaeger has been a real *124 estate broker for over 50 years. On or about September 2, 1939, Heber entered into a partnership agreement with Yaeger under the terms of which they acknowledged that they were the equal owners of certain properties described therein as Parcels 1 and 2; that they intended to acquire additional properties in which they were to have an equal interest; that they were to own and operate these and other properties as equal partners; that should either partner become dissatisfied, or desire to withdraw, such partner should not be permitted to do so before making a proposal either to sell or purchase the undivided one-half interest in the fee ownership of properties owned by the other party; and that in the event no sale occurred within a period of thirty days, the partnership was to be dissolved by operation of law. In the event of a dissolution of the partnership, the properties or the proceeds thereof were to be divided equally between Heber and Yaeger. Parcels 1 and 2, which were located in Fullerton, California, contained certain improvements consisting of buildings which produced rental income. Legal title to Parcels 1 and 2 was held by Security-First National Bank of Los Angeles *125 as trustee for the partnership. After the execution of the said partnership agreement on or about September 2, 1939, the partnership acquired a liquor store and additional properties designated as Parcels 3, 4, 5, and 6, representing vacant lots, title to which was transferred to Yaeger's attorney. In January or February of 1944, the partnership also acquired some property designated as Parcel 7, which contained a number of citrus trees, but was not productive of income. All of the properties of the partnership were managed solely by Yaeger. Heber did not participate in the management thereof. On August 10, 1944, Heber and Yaeger executed an agreement (hereinafter referred to as the termination agreement) which recited that they had formed a partnership on September 2, 1939, relating to their property holdings. The termination agreement specifically described these various properties and then provided that: [The] parties hereto [Heber and Yaeger] desire to clarify and modify the terms of said documents [the deeds to the various properties and the partnership agreement], as well as covenant and agree by the terms hereof to partition and divide said properties, as hereinbefore *126 set forth. The termination agreement then provided that: (1) * * * the property now held in trust known as Parcels One and Two in this Agreement, shall be conveyed in fee to the party of the first part [Yaeger], but reserving a life estate in and to one-half of the rents, issues and profits to the party of the second part [Heber] for and during the period of her natural life; (2) That Parcels Three, Four, Five and Six, the fee title of which is now vested in the party of the second part [Heber], shall be conveyed in fee to the party of the first part [Yaeger], but reserving a life estate in and to one-half of the rents, issues and profits to the party of the second part [Heber] for and during the period of her natural life; (3) That Parcel Seven, the fee title of which is now vested in the party of the first part [Yaeger], there shall be conveyed to the party of the second part [Heber] a life estate, consisting of one-half of the rents, issues and profits, for and during the period of her natural life, and the fee title, subject to said life estate, shall remain in the party of the first part [Yaeger]; * * *
(5) That the parties hereto do mutually agree *127 to dispose of all the property herein mentioned, real and personal, excepting Parcels One and Two, and to apply the net proceeds received or derived from the sale of said separate parcels toward the liquidation of the present indebtedness on parcels One and Two, to the end that said properties may be freed from indebtedness and improved, so as to obtain a maximum rental income for the benefit of the parties hereto; (6) That, beginning on the first day of September, 1944, each of the parties hereto shall be entitled to a drawing account in an equal amount of at least One hundred Dollars ($100.00) per month, which sum shall be withdrawn by check from the accounts of the properties, real and personal, hereinabove mentioned, and that all sums so withdrawn shall be accounted for and charged against the net income to which each of the parties may be entitled; * * *
(9) It is stipulated and agreed between the parties hereto that should the undivided one-half of the net income of the properties then owned be insufficient to care for the parties hereto respectively, by reason of illness, want or other necessity, and to obtain necessary medical or other assistance, for and during such *128 period or periods of illness, want or other necessity, then the parties hereto agree to use so much of the principal or corpus of the properties hereinbefore mentioned as shall be necessary in order to enable the party thus in need to be maintained and cared for during such period or periods of illness, want or other necessity; (10) It being further stipulated and agreed between the parties hereto that no indebtedness shall be contracted on behalf of any of the properties herein mentioned without the concurrence of both parties hereto, except for the necessary operating expense of said properties, or any parcel thereof; provided, however, that each of the parties agree to sign any document or instrument necessary to renew present existing indebtedness when the same becomes due and payable or, when opportunity presents itself, to renew the indebtedness upon more favorable terms for the benefit of the parties hereto; (11) It being further stipulated and agreed by and between the parties hereto that there shall be kept at all times just and true books of account wherein shall be entered and set down all moneys received, paid, laid out and expended in and about the management and maintenance *129 of the properties hereinbefore mentioned; (12) It is stipulated and agreed that hereafter, on the 31st day of December of each year a full, true and accurate account shall be made in writing of all assets and liabilities relating to any of the properties herein mentioned, and also of the receipts and disbursements, and the net profits thereof shall be ascertained. In preparing such an account there shall be charged the drawing accounts of each of the parties hereto, as well as all other expense of conducting the said properties, and also all losses and other charges incident and necessary in caring [carking] on and maintaining said properties; that said books shall be audited and closed and such statements rendered and delivered to the parties hereto, and there shall be an annual settlement accordingly, and both parties may withdraw the balance of her share of the net profits, if any; * * *
Pursuant to the termination agreement, deeds were executed containing the following language. (1) With respect to Parcels 1 and 2: SECURITY - FIRST NATIONAL BANK * * * does hereby grant to EMMA M. STEEVE [Heber] * * * a life estate consisting of one-half of the net rents, issues *130 and profits for and during the period of her natural life only, and to LILLIAN E. YAEGER * * * the remaining net income, together with title in fee, subject to such life estate, in and to that real property * * * (2) With respect to Parcels 3, 4, 5, and 6: EMMA M. STEEVE [Heber] * * * does hereby grant to LILLIAN E. YAEGER * * * all that real property situate in the County of Orange, State of California, described as follows [describing Parcels, 3, 4, 5, and 6]. EXCEPTING AND RESERVING * * * to the Grantor, for and during the period of her natural life only, an estate consisting of one-half of the rents, issues and profits received or derived therefrom. (3) With respect to Parcel 7: LILLIAN E. YAEGER * * * does hereby grant to EMMA M. STEEVE [Heber] * * * a life estate consisting of one-half of the rents, issues and profits received or derived from all that real property * * * Subsequent to August 10, 1944, Parcels 3 through 6 were sold to third parties and the proceeds applied to reduce the indebtedness on Parcels 1 and 2. Parcels 1, 2, and 7 were retained, and it is the income from these properties that gives rise to the tax controversy involved in these proceedings. *131 (Parcels 1, 2, and 7 will hereinafter be referred to collectively as the Fullerton properties.) The deeds were then recorded in accordance with the termination agreement. Thereafter, at all times relevant hereto, Yaeger continued to manage and control the Fullerton properties, taking charge of collecting the rents and paying the property taxes and other expenses of said properties. Yaeger's purpose in causing Heber to execute the termination agreement was to reshuffle their interests in the partnership properties in order to reflect the fact that Heber, because of illness, had become unable to assist Yaeger in any of the affairs of the partnership. When Heber and Yaeger executed the termination agreement, it was the belief and intention of each of them that the partnership theretofore existing between them was thenceforth terminated. Each of them was aware at that time that Heber was receiving thereby a life estate in an undivided one-half of the Fullerton properties and that Yaeger was also receiving, as a tenant in common a life interest in an undivided one-half of said properties, measured by Heber's life, plus the entire ownership of the properties upon Heber's death. The *132 basic manner in which the former partnership properties were to be operated and maintained was significantly altered as a result of the execution of the termination agreement. Instead of continuing to acquire new properties, it was agreed that certain nonincome-producing properties were to be sold. Pursuant to the terms of the termination agreement, Yaeger used the proceeds from the sales to effect substantial renovations of the Fullerton properties and to reduce the outstanding indebtedness thereon. Yaeger also used a portion of the net rentals produced by said properties to effect these ends. After the execution of the termination agreement, Heber moved to Los Angeles. Yaeger remitted to Heber the $100 per month as provided for in paragraph 6 of the termination agreement until January 1, 1948. Thereafter, Yaeger ceased paying any monies to Heber with respect to her interest in the Fullerton properties, but began to pay herself $200 per month as a manager's salary, charging this amount against the rental income produced by the Fullerton properties. In January 1949 Heber sought legal counsel pertaining to her rights under the termination agreement. On August 4, 1949, Heber initiated *133 proceedings against Yaeger in the Superior Court, Orange County, California. Heber's complaint set up separate causes of action for rescission of the termination agreement, reformation, declaratory relief, and quiet title. That court in an unreported opinion found, among other things, that Heber was, by virtue of the termination agreement, vested with a life estate in and to an undivided one-half interest in the Fullerton properties for and during her life; that Yaeger, by virtue of the termination agreement, acceded to ownership of the remainder interest in said properties; that Yaeger had not sold all of the property agreed to be sold for the purpose of paying off the encumbrances on the Fullerton properties; and that Yaeger had not paid Heber her full share of the income from the Fullerton properties. That court, moreover, in approving the report and account prepared by a referee, found in accordance therewith that Yaeger had collected, as rents and income from the Fullerton properties, during the period in question, namely, from August 10, 1944, through December 31, 1952, the total sum of $167,998.18; that she had expended $101,926.50 for maintenance of the property, leaving a *134 net income of $66,071.68, of which Heber was entitled to one-half or $33,035.84; and that Yaeger had paid Heber only $5,942.39, leaving a balance of $27,093.45 owned to her. The court held that in the determination of Heber's share of the net income from the Fullerton properties, Yaeger was not entitled to deduct depreciation on the properties. A final judgment was entered in accordance with these findings, and Heber was awarded a total of $27,093.45, plus interest from August 10, 1944, through December 31, 1952. On October 26, 1956, this judgment was affirmed on appeal by the District Court of Appeals, Fourth District, California sub nom. Steeve v. Yaeger, 145 Cal. App. 2d 455, 302 P. 2d 704 (1956). Yaeger paid the amounts awarded to Heber pursuant to this judgment, as follows: Year
Payments on
Paid
Judgment
Interest
1955
$ 9,086.39
1957
18,007.06
$5,509.30
Total
$27,093.45
$5,509.30
During the years 1953 through 1955, Fullerton properties had net income, adjusted in accordance with the decision in Steeve v. Yaeger, supra, in the total amount of $31,956.76. In accordance with the principles set forth in that decision, *135 Heber's share thereof was $15,978.38. Payments to Heber of her share of the net income from the Fullerton properties allowable to the years 1953, 1954, and 1955 were made as follows: Year Paid
Amount
1954
$ 1,200.00
1955
1,100.00
1956
5,536.30
1957
8,142.08
1958
Total
$15,978.38
During the calendar years 1956 through 1958, the Fullerton properties had net income, adjusted in accordance with the decision in Steeve v. Yaeger, supra, as follows: Year
Net Income
1956
$ 8,697.33
1957
10,063.55
1958
8,814.03
The amounts allocated on the books of Fullerton properties as Heber's allocable share of the net income for those years were as follows: Share net in-
come allocated
Year
to Heber
1956
$ 4,348.67
1957
5,031.78
1958
4,407.02
Total
$13,787.47
The amounts actually received by Heber during each of those years in respect of such allocable share of net income were as follows: Amount of share of
net income actually
Year
received by Heber
1956
$ 1,200.00
1957
4,348.67
1958
5,031.78
Total
$10,580.45
During the years 1956 through 1958, Heber received the following *136 aggregate amounts in respect of her interest in the Fullerton properties: Total Amount
Year
Received
1956
$ 6,736.30
1957
36,805.17
1958
5,031.78
During the taxable year 1956, Heber reported the receipt of ordinary income in the amount of $4,547.27 from the Fullerton properties. Respondent, pursuant to statutory notice of deficiency, determined that Heber during 1956 had received ordinary income from the Fullerton properties in the aggregate amount of $9,884.96 and increased her taxable income that year by $5,337.69. In her income tax return for 1957, Heber reported the receipt from the Fullerton properties of $5,840.38 and claimed that of that amount of $3,929.08 represented gain arising from the sale of a capital asset held for more than six months. Prior to 1957, Heber had reported all money received by her with respect to her interest in the Fullerton properties as ordinary income. In 1957, after receiving payment of some $36,805 in respect of her interest in the Fullerton properties, Heber was advised by her accountant to treat all amounts received by her from said properties as proceeds from the sale or exchange of a capital asset held in excess *137 of six months. The capital gain of $3,929.08 reported in Heber's 1957 income tax return attributed to the Fullerton properties, was determined by her accountant pursuant to a "RECOMPUTATION OF [HER] FEDERAL INCOME TAX FOR [THE] YEARS 1945 THROUGH 1956 INCLUSIVE." The accountant "recomputed" Heber's income tax for those years (1) by deducting from her gross income as reported for each such year the amount of income received by her from the Fullerton properties during such year and (2) by adding thereto an amount labeled "Capital Gain Resulting from Sale of Fullerton Properties." There is nothing in the record to indicate the ground upon which Heber's accountant proceeded to recompute her net or taxable income during such years. Respondent, pursuant to a statutory notice of deficiency, increased Heber's taxable income for the year 1957 as follows: Taxable income as disclosed by origi-
nal return
$ 7,921.53
Additional income and un-
allowable deductions: (a) Interest income
$ 5,509.30
(b) Judgment income
14,166.90
(c) Ordinary income -
Fullerton properties
5,031.77
24,707.97
Total
$32,629.50
Nontaxable income and ad-
ditional deductions: (d) Capital gain
$ 2,258.54
(e) Exemption
600.00
2,858.54
Taxable income as corrected
$29,770.96
*138 Respondent explained these adjustments by stating in part, that Heber had failed to report interest income in the amount of $5,509.30; that the net amount of $14,166.90 received by you from a judgment in 1957 constitutes taxable income for 1957 * * * [and] that you are not entitled to compute the tax on such income under the provisions of sections 1301- 1307 of the Internal Revenue Code of 1954
and that she received as ordinary income $5,031.77 as opposed to the $3,929.08 reported by petitioner as long-term capital gain from the Fullerton properties. Heber's income tax return for 1958 showed that she received $5,031.78 from the Fullerton properties. Of that amount, $3,923.50 was reported as long-term capital gain. Respondent, pursuant to a statutory notice, determined that "such gain is taxable as ordinary income in the amount of $3,298.74" and increased Heber's taxable income by that amount. With respect to Yaeger, respondent in his statutory notice of deficiency increased her taxable income for the year 1955 by $7,207.88. He explained this action by stating: (a) It is determined that your income from the "Fullerton Properties" totaled $11,990.62 *139 instead of the $4,782.74 reported on your income tax return for 1955. * * * Respondent also decreased Yaeger's taxable income by the $2,400 management fee which the court in Steeve v. Yaeger, supra, ruled should be returned to the net income of the Fullerton properties. Respondent, pursuant to his statutory notice of deficiency, increased Yaeger's taxable income for the years 1956 through 1958 by determining that the entire net income of the Fullerton properties during each of these years, rather than one-half of the net income as reported by Yaeger, should be included in her taxable income. Respondent further determined in the deficiency notice that Yaeger was not entitled to deductions in the respective amounts of $9,086.39 and $3,766.32 during 1955 and 1957 as a result of payments on the judgment awarded Heber in the decision Steeve v. Yaeger, supra. Opinion Respondent took inconsistent positions in the notices of deficiency issued to Yaeger and Heber, respectively. Essentially it was respondent's position, in the notice issued to Yaeger, that Yaeger was the owner of all the net rentals produced by the Fullerton properties but that during the *140 years 1955 through 1958 she failed to include the entire amount of such rentals in her gross income, reporting only 50 percent thereof. With respect to Heber, it was respondent's position, in effect, that Heber was entitled to one-half of the net income produced by the Fullerton properties; that all amounts which she received during the years 1956 through 1958 from Yaeger or the Fullerton properties were with respect to her interest in the net income of said properties; and that all such amounts constituted ordinary income rather than gain from the sale of Heber's partnership interest to Yaeger in 1944. At the trial and on brief, respondent assumed a neutral position and presented no legal arguments. He merely contended that if the execution of the termination agreement on August 10, 1944, by Heber and Yaeger constituted a sale of Heber's partnership interest, then, as a result, the tax consequences to the respective partners would be (1) that Yaeger would be taxable on the entire net income produced by the Fullerton properties during the years 1955 through 1958 and (2) that the amounts received by Heber during 1956 through 1958 would constitute gain received upon the sale or exchange *141 of a capital asset held in excess of six months. Respondent further took the position that if, by virtue of the termination agreement, the partnership was terminated by a dissolution and Heber was distributed a life estate in an undivided half of the Fullerton properties and Yaeger the remainder interest, then Yaeger and Heber would each be taxable on one-half of the net income of the properties. Both Heber and Yaeger, it appears, agree with respondent's legal conclusions concerning the two different tax consequences that would result if the execution of the termination agreement were found to have terminated the partnership by a dissolution, on the one hand, or by Heber's sale of her partnership interest, on the other hand. It is argued on behalf of Heber that the effect of the termination agreement was that Yaeger purchased Heber's interest in the partnership. It is contended on behalf of Yaeger that the termination agreement effected a dissolution of the partnership in 1944, with Heber receiving a life estate in an undivided one-half of the properties and Yaeger receiving the remainder interest as liquidating distributions in kind. In the alternative, Yaeger raises the contention *142 that the partnership between herself and Heber did not cease upon the execution of the termination agreement but continues in full force and effect down to the present time. Yaeger's alternative contention is groundless. A review of all the circumstances before us leads us to conclude that after the execution of the termination agreement and the accompanying deeds on August 10, 1944, the partnership between Heber and Yaeger terminated. [2] We have set forth in our Findings of Fact the various factors upon which we base this conclusion. Several of the more significant factors upon which we rely are: (1) Heber and Yaeger intended, by their execution of the termination agreement, to terminate the partnership, see Commissioner v. Tower, 327 U.S. 280 (1946); and L. C. Olinger, 10 T.C. 423 (1948); (2) that after the execution of the termination agreement, Yaeger so thoroughly dominated the conduct of the Fullerton properties and operated them for her own purposes that Heber did not occupy the status, or enjoy the benefits, of a partner. At best, their joint ownership of the Fullerton properties could most adequately be described by that term coined by Roman jurists, *143 a Societas Leonina.[3] See Edward C. James, 16 T.C. 930, 940 (1951), affd. 197 F. 2d 813 (C.A. 5, 1952); and Joe Balestrieri & Co. v. Commissioner, 177 F. 2d 867 (C.A. 9, 1949), affirming a Memorandum Opinion of this Court. And (3) moreover, this was not a situation where the business of the partnership continued to be carried on while it was in the process of liquidation. Cf. Heiner v. Mellon, 304 U.S. 271 (1938). The assets of the partnership were received in kind by the former partners upon the execution of the termination agreement. See Anne Jacobs, 7 T.C. 1481, 1483 (1946). (This is so whether Heber is treated as having sold her partnership interest [4] or whether Heber and Yaeger are treated as having received their interests in the former partnership properties as a liquidating distribution in kind from the partnership.) The interests which Heber and Yaeger received in the former partnership properties were substantially altered after the execution of the termination agreement, as were the relationship between Heber and Yaeger and the manner in which the properties were operated and maintained. The execution *144 of the termination agreement did not affect a mere reorganization or modification of the partnership. ( Section 708 of the Internal Revenue Code of 1954, which embodies an entirely different approach from prior law concerning the continuation or termination of partnerships does not apply to the facts before us.) In our opinion, the *145 parties have misdirected their analyses of the issue before us; for it makes no difference in the tax consequences pertaining to Heber and Yaeger during the years in issue, at least to the extent questioned by respondent, whether the partnership was dissolved by the execution of the termination agreement or whether Heber, by the execution of the termination agreement, effected a sale of her partnership interest to Yaeger. The reason for this result is that the tax consequences to both Heber and Yaeger, for their respective taxable years in issue, depend upon the character and amount of income received by each of them during said years from the Fullerton properties. The character and amount of income received by each of them are, in turn, determined by the nature of the interests in the former partnership properties that Heber and Yaeger were left with after their execution of the termination agreement and the accompanying deeds. Upon an examination of all the facts before us, [5] it is clear that after the execution of the termination agreement and the various deeds mentioned therein, Heber, in lieu of her partnership interest, was left with a life estate in an undivided one-half *146 of the former partnership properties. In lieu of her partnership interest, Yaeger received (1), as a tenant in common with Heber, a present interest in the Fullerton properties, namely a life estate, measured by Heber's life, in an undivided one-half of said properties, plus (2) a future interest, namely, the entire fee interest therein upon Heber's death. [6] Cf. Rev. Rul. 56-221, C.B. 1956-1, 58. *147 Therefore, whether we conclude (1) that Heber sold her partnership interest to Yaeger in return for a life estate in an undivided one-half of the Fullerton properties or (2) that Heber received said life estate as a liquidating distribution, in kind, upon the dissolution and termination of the partnership, Heber, neverthless, must report, as ordinary income (reduced by any available deductions for amortization or depreciation), her 50 percent share of the net rentals produced by said properties and attributable to her life estate therein. See section 1.61-8, Income Tax Regs.[7]
Since Heber, during the years in question, prepared her income tax returns on the cash method of accounting, she *148 is taxable only upon her receipt of the amounts paid to her in respect of her life estate in the Fullerton properties. These amounts include the sum of $18,007.06, paid to Heber in 1957 by Yaeger in partial discharge of the judgment awarded Heber with respect to her share of the net rentals of the Fullerton properties between January 1, 1948, through December 31, 1952, as well as interest thereon in the amount of $5,509.30. See Western Products Co., 28 T.C. 1196, 1207-1208 and 1210-1211 (1957), relating to the inclusion in income, in the year of receipt, of certain amounts awarded to the petitioner therein, pursuant to a judgment rendered in an action for an accounting, in lieu of certain dividends and rents that had been improperly withheld from said petitioner. See also Parr v. Scofield, 185 F. 2d 535 (C.A. 5, 1950); and Farrell v. Commissioner, 134 F. 2d 193 (C.A. 5, 1943), affirming 45 B.T.A. 162 (1941). [8] The amounts awarded to Heber pursuant to the judgment in Steeve v. Yaeger, supra, were in lieu of Heber's share of the net rentals from the Fullerton properties during the years 1948 through 1952, which monies *149 the California court found actually belonged to Heber but had been improperly withheld by Yaeger.[9]
*150 Heber is also taxable upon her receipt of the payments to her in 1956 and 1957 of the amounts of $5,536.30 and $8,142.08, respectively. The payments, totaling $13,678.38, represent the major portion of Heber's share of the net income ($15,978.38) from the Fullerton properties for the years 1953 through 1955. An examination of the record as a whole indicates that, because of Yaeger's complete control over the affairs and operation of the Fullerton properties at all times relevant hereto, no part of these amounts can be considered to have been set aside for Heber during the years 1953 through 1955 subject to her dominion or unfettered control. It would appear that Yaeger was withholding these monies from Heber pending the decision on appeal in Steeve v. Yaeger, supra.Unlike the situation that generally prevails in the case of joint owners, it does not appear to us that one-half of the net rents earned by the Fullerton properties during the years 1953 through 1955 were constructively received by Heber during such years. Cf. C. W. Gallagher, 2 B.T.A. 1057 (1925). Therefore, it is our conclusion that the $5,536.30 and $8,142.08 received by Heber during 1956 *151 and 1957 are includable in her gross income during such years. [10]
On the basis of the foregoing, we further conclude that, during Yaeger's taxable years in issue, only one-half of the net rentals generated by the Fullerton properties are includable in her gross income. Since Yaeger has made no argument on brief concerning respondent's disallowance of the deductions she claimed during the years 1955 and 1957 for payments made by her to Heber in the respective amounts of $9,086.39 and $3,766.32, pursuant to the judgment *152 in Steeve v. Yaeger, supra, we conclude that she has abandoned this issue. Decisions will be entered under Rule 50. Footnotes
1. Henry D. Heber died on or about July 29, 1962. Petitioner Emma M. Heber was duly appointed, and presently is, the administratrix of the estate of Henry D. Heber. The estate was joined as a petitioner solely because of the fact that joint returns were filed during the years in issue.↩
2. None of the parties has questioned the fact that the agreement of September 2, 1939, between Yaeger and Heber created a partnership. Nor do we believe there would be any ground for so doing. When the 1939 agreement was executed, the parties thereto, from all that appears in this record, intended to form a partnership and did, in fact, function as such, despite the fact that most of the management functions devolved upon Yaeger. ↩
3. This epithet is an allusion to the fable of the lion, who after entering into a partnership with the other wild beasts for hunting, appropriated the whole prey to himself. ↩
4. If Heber is treated as having sold her partnership interest to Yaeger, it would have been impossible for Yaeger to have continued to operate the properties in partnership form. Cf. Reg. 111, sec. 29.3797-1, I.R.C. 1939↩.
5. The parties have stipulated to the litigation reported in Steeve v. Yaeger, 145 Cal. App. 2d 455, 302 P. 2d 704↩ (1956), and we interpret that their purpose in so doing was to provide this Court with some further background in the subject controversy. 6. Heber does not contend, nor would the record support an argument to the effect, that the consideration received by Heber for selling her partnership interest was merely Yaeger's promise to pay a percentage of the net profits of the Fullerton properties. Cf. United States v. Yerger, 55 F. Supp. 521 (D.C.E.D. Pa. 1944); and Burnet v. Logan, 283 U.S. 404 (1931); see also May T. Hrobon, 41 T.C. 476, 492-498 (1964). The District Court of Appeals, Fourth District of California, in Steeve v. Yaeger, supra↩, held that upon the execution of the termination agreement in 1944 Heber received a life estate in an undivided one-half of the Fullerton properties. Upon an independent examination of all of the facts before us, it is our conclusion that, for tax purposes, the interest Heber received upon the execution of the termination agreement was the same as that found by the California court. We have set forth in some detail in our Findings of Fact the particular factors which cause us to reach this conclusion. Some of those factors which we rely upon are that Heber had a right to one-half of the net rents from the Fullerton properties only during her lifetime; that her interest included a right to invade the corpus in the event of lack of sufficient income in time of Heber's illness; her right to veto the incurrence of further indebtedness on the Fullerton properties; and her right to a yearly accounting with respect to the receipts and expenses of the Fullerton properties.
7. The only questions that would be resolved by a determination of whether a sale of a partnership interest or a liquidation and termination of the partnership occurred are (1) whether Heber should have recognized gain or loss upon her receipt in 1944 of the above-mentioned life estate and (2) the correct bases of Heber and Yaeger in the respective assets they were left with upon the execution of the termination agreement and the termination of the partnership.↩
8. Pursuant to the provisions of sec. 1305, I.R.C. 1954, the tax attributable to Heber's receipt of damages as a result of the decision in Steeve v. Yaeger, supra, may not exceed the aggregate of the increases in her taxes for the years 1948 through 1952 had the allocable portions of such damages been included in her gross income for such years. It is to be noted that sec. 1305(b), I.R.C. 1954, as in effect during the years in issue, specifically provided that in the computation of the tax thereunder the taxpayer shall be entitled to deduct all credits and deductions for depletion, depreciation, and other such items to which he would have been entitled had such income been received by the taxpayer in the year he would have received it but for the breach of contract or fiduciary duty. The effect of this provision is specifically to exempt amounts subject to sec. 1305 from applicability of the rule that a deduction for depreciation or amortization is allowable only in the year the depreciation was sustained. (Cf. Motor Car Supply Co., 9 B.T.A. 556 (1927); Fort Orange Paper Co., 1 B.T.A. 1230 (1925); and Parr v. Scofield, 185 F. 2d 535↩ (C.A. 5, 1950)).
9. This is not a situation involving impounded earnings, the taxes upon which have been paid by a receiver or trustee pending determination of title thereto. Therefore, the line of decisions holding that such funds are not includable upon their recovery by a successful litigant is not relevant to the damages awarded to Heber. Cf. North American Oil v. Burnet, 286 U.S. 417, 422-423 (1932); and Lee McRitchie, 27 T.C. 65 (1956). If Yaeger, during the years 1948 through 1952, paid any taxes upon her receipt of Heber's share of the income from the Fullerton properties with respect to which the judgment in Steeve v. Yaeger, supra, was awarded to Heber, Yaeger paid such taxes under a claim of right, rather than as a trustee under an express trust for Heber. Cf. Vincent v. Commissioner, 219 F. 2d 228 (C.A. 9, 1955), reversing 18 T.C. 339 (1952); and Western Products Co., 28 T.C. 1196, 1210-1211↩ (1957).
10. The amelioratory provisions of sec. 1305, I.R.C. 1954, in effect during the years in issue, are not applicable to the aforementioned amounts of $5,536.30 and $8,142.08 because they were not received by Heber as a result of a civil action for breach of contract or breach of fiduciary duty of relationship, but were received in payment of Heber's share of the net income from the Fullerton properties for the years 1953 through 1955 as a result of her life estate in an undivided one-half of said properties. The parties in the Rule 50 computations can give effect to the proper amount of depreciation or amortization deductions allowable.↩